UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DAVID BURNS,<br><br>    Plaintiff<br><br>v.<br><br>JESSE COX, et. al.,<br><br>    Defendants | Case No.: 3:18-cv-00231-MMD-WGC<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 74 |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Partial Summary Judgment. (ECF Nos. 74, 74-1 to 74-8.) Plaintiff filed a response. (ECF No. 77.) Defendants filed a reply. (ECF No. 78.)

After a thorough review, it is recommended that Defendants' motion be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Second Amended Complaint (SAC), ECF No. 41.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*) Defendants are Daniel Schmidt, Michael Oxborrow, Tasheena Sandoval, Donald Southworth, William Williams, Edward Isenbergh, Jesse Cox[1], Tylor DeShane, Robert Rose, and Debra Boon-Sharp.

---

[1] The order screening the SAC inadvertently left out Cox; however, Cox is clearly named in Count II, and has responded to the SAC.

A summons was issued and returned unexecuted for Timothy Filson (ECF No. 70), and on February 3, 2020, District Judge Du issued a notice of intent to dismiss Filson under Federal Rule of Civil Procedure 4(m), giving Plaintiff until March 4, 2020, to file a proof of service for Filson or show good cause as to why service was not made. (ECF No. 71.) As of the date of this Report and Recommendation, no proof of service of good cause showing has been filed as to Filson; therefore, Filson should be dismissed without prejudice under Rule 4(m).

The court screened Plaintiff's SAC, and allowed him to proceed with the following claims: (1) a Fourteenth Amendment due process claim in Count I against Schmidt, Oxborrow, Sandoval, Southworth and Filson, based on allegations that Plaintiff was placed in administrative segregation for four months without a review under conditions constituting an atypical and significant hardship; and (2) an Eighth Amendment conditions of confinement claim in Count II against Williams, Isenbergh, Deshane, Rose, Boon-Sharp, and Cox (who is named in Count II but inadvertently left out of the order), based on allegations that while in administrative segregation, the noise from mentally ill inmates housed in the unit caused Plaintiff to suffer excruciating headaches and sleep deprivation which these defendants knew of and failed to prevent. (ECF No. 40.)

Defendants move for summary judgment only with respect to the due process claim. Defendants argue that Plaintiff was housed as close custody and then after he was involved in a fight he was moved to another unit that was also close custody, and was not placed into administrative segregation; therefore, he was not entitled to a hearing. Alternatively, they argue they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

1 pleadings and set forth specific facts by producing competent evidence that shows a genuine
2 dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Due Process**

On June 3, 2017, Plaintiff was involved in a fight with two other inmates in Unit 7 at ESP; and, that day he was moved to Unit 2 at ESP. (ECF No. 74-4 at 2.) Plaintiff was charged with fighting, and a disciplinary hearing on the fight was conducted on July 21, 2017. (ECF No. 74-5.) Plaintiff was moved from Unit 2 on September 21, 2017. (ECF No. 74-4 at 2.)

Plaintiff filed a grievance regarding the relocation, grievance number 20063052857, on August 14, 2017, stating that on June 3, 2017, he was brought to segregation Unit 2 and suffered a loss of privileges and quality of life in his prison living conditions. He stated that he was confined for 24 hours, some days for 23 hours; he was deprived of the ability to "level down," work a job, and be in a place where family prison visits are more accessible to out of state family; he could not associate with other prisoners in the open; he was not permitted to attend outside recreation in a congregated setting; he also could not attend meals with other prisoners or attend religious services. He sought damages against Oxborrow for not giving him a due process hearing, and against Southworth for confining him in segregation. He asserted that Southworth gave several other inmates in the unit a hearing. He reported distress from the fact that he was confined with mentally ill inmates, and the fact that he was in a solitary cell. (ECF No. 774-2 at 11-13.)

Southworth denied Plaintiff's informal level grievance, asserting that records show he was moved from a close custody general population level in Unit 7B to a close custody level in Unit 2 on June 3, 2017. The move was subsequent to a violent incident that occurred that day,

1  and Plaintiff was pending a disciplinary hearing for his involvement in the incident. Southworth
2  advised Plaintiff that because his custody level remained the same, no due process hearing was
3  warranted. He was told that his classification would be reviewed upon completion of the
4  disciplinary hearing. (ECF No. 74-2 at 10.)

5  Plaintiff filed a first level grievance, asserting that a due process hearing was warranted
6  because in Unit 7, he had four hours of tier time one day, and two hours the next day. In Unit 2,
7  it said on his door: "Segregation Unit 2." (ECF No. 74-2 at 8.) In Unit 2 he had no tier time, and
8  only one hour on the unit recreation yard. (*Id*. at 9.)

9  Filson denied the first level grievance, advising Plaintiff that as with the response at the
10 informal level, a due process hearing was not required when he moved from Unit 7 to Unit 2
11 because his custody level did not change. He was moved because he was involved in an incident
12 in Unit 7 and was pending a disciplinary hearing based on his involvement in the incident.
13 (ECF No. 74-2 at 7.)

14 In his second level grievance, Plaintiff stated that he lost: the use of tier time, the use of
15 the phone during his tier time, the use of tier time to shower, the ability to congregate in an open
16 setting with people on his tier, the ability to play in sporting events with others. He had no due
17 process hearing before or after being placed in Unit 2 in a solitary cell. He also asserted that he
18 was housed near mentally ill inmates who made his time unbearable with banging, screaming,
19 yelling, crying, and banging of cups on walls. He stated that this was not the normal practice in
20 general population or administrative segregation. (ECF No. 74-2 at 5.)

21 At the second level, Wickham advised Plaintiff that he based his claim on a faulty
22 understanding of the due process requirements. He was told that he was not moved to
23

administrative segregation, but from a close custody general population unit to a close custody general population unit. (ECF No. 74-2 at 3.)

Administrative Regulation (AR) 507 contains NDOC's policies and procedures for administrative segregation, which gives the inmate a hearing within three days of being placed in administrative segregation. (ECF No. 74-1.)

In his declaration, defendant Wickham states that he responded to Plaintiff's second level grievance in 2017, and in reviewing the grievance, he determined that Plaintiff was not reclassified as part of the move because he was moved from a close general population unit (Unit 7) to another close general population unit (Unit 2) in the same institution; therefore, he was not entitled to a classification hearing. (Wickham Decl., ECF No. 74-6.)

Consistent with his grievance on the issue, Plaintiff maintains that when he was moved to Unit 2, it was described as a segregation unit. Plaintiff did not receive a hearing before the move. He went from close custody in Unit 7 where he had open tier time, to Unit 2 where he was in lock up in a single cell. Plaintiff points to AR 521.02, which states that close custody criteria includes assignment to specialized housing areas of medium security institutions such as administrative or protective segregation or disciplinary segregation. He states that while in Unit 2, he was handcuffed while going to the showers every three days, and while going and coming from the yard, one cell at a time, once a day for one hour. He indicates that the segregation papers were eventually removed from his cell door, and he was then allowed to use the tier, phone, shower and yard, but still while segregated. He claims that he did not receive one normal night of sleep between June 3, 2017 and September 20, 2017, due to the mentally ill inmates housed near him, which gave him excruciating headaches requiring medication. (Pl. Decl., ECF No. 77 at 11-12; Grievance at ECF No. 74-2.)

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To invoke its protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Once the plaintiff has established one of these interests is at stake, the court's analysis turns to whether the inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003) (citations omitted).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty'[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution); *Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974) (liberty interest in avoiding withdrawal of state-created system of good-time credits)). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id*. (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

Courts have uniformly held that placement in administrative segregation for non-punitive reasons does not give rise to a liberty interest from the Constitution itself. *See Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). As the Supreme Court explained, administrative segregation, which is "used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer," "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt*, 459 U.S. at 468.

"[A] liberty interest in avoiding particular conditions of confinement *may* arise from state policies or regulations, subject to important limitations set forth in *Sandin v. Connor*, 515 U.S.

472 (1995)." *Wilkinson*, 542 U.S. at 222 (emphasis added). To establish a due process claim related to placement in administrative segregation, an inmate must show that the classification resulted in conditions that amount to an "atypical and significant hardship in relation to the ordinary incidents of prison life." *See Chappell*, 706 F.3d at 1064.

If an inmate demonstrates a protected liberty interest, in the context of placement in segregated housing for non-punitive reasons, the inmate must be given notice of the reason for the segregation and be provided, within a reasonable time after such placement, with an informal, non-adversary review of the evidence justifying the decision to segregate the inmate. *See Hewitt*, 459 U.S. at 476. Unlike a disciplinary proceeding, an inmate is not entitled to "detailed written notice of charges, representation of counsel or counsel substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986), *abrogated in part on other grounds in Sandin v. Connor*, 515 U.S. 472 (1995). After being placed in segregation, prison officials must periodically review the initial placement. *See Hewitt*, 459 U.S. at 477, n. 9 (noting this does not necessarily require the submission of any additional evidence or statements).

Plaintiff has raised a genuine dispute of material fact as to whether he was in fact placed in administrative segregation, and whether he was subject to conditions amounting to an atypical and significant hardship when he was moved from Unit 7 to Unit 2 that would entitle to him to due process protections of a hearing and periodic review of his classification status. While Defendants maintain that Plaintiff's custody level remained the same, Plaintiff produces evidence that he faced very different conditions when he was moved to Unit 2: he had no tier time and was locked in his cell 23-24 hours a day; he was not able to have yard time among other inmates and

instead was relegated to one hour of yard time; he could not use his time to shower or use the phone and his visitation privileges were more restricted; he could no longer participate in sports events with other inmates. Every time he left his cell, he was in handcuffs, up until August 2, 2017; however, at that point, he was still segregated from other inmates. Importantly, insofar as the atypical and significant hardship inquiry is concerned, he maintains that when he was moved to Unit 2, he was housed near mentally ill inmates who made his time unbearable with banging, screaming, yelling, crying, and banging of cups on walls. As a result, he suffered from lack of sleep, and excruciating headaches. He also presents evidence that when he moved to Unit 2, there was a sign on his door that said, "Segregation Unit 2." Thus, Plaintiff presents evidence that he was housed segregated housing, in solitary confinement, with no tier time and only one hour of yard time per week, with a continual lack of sleep and headaches due to the proximity to loud mental health inmates, for 110 days.

Plaintiff also submits AR 521, which is NDOC's regulation concerning custody categories and criteria. (ECF No. 77 at 14-21.) "Close custody is a restrictive level of supervision for inmates whose offense or institutional conduct indicates that they represent a potential for violence, escape, or disruption of institutional operations without the controls inherent in close custody." (*Id.* at 15.) Close custody characteristics can include, among other things, assignment to single cells for administrative or disciplinary segregation. (ECF No. 77 at 15, AR 521.02.2.C.) In addition, close custody criteria can include: "[a]ssignment to specialized housing areas of medium security institutions such as *administrative* or protective segregation, or disciplinary segregation, detention, or disruptive group management." (ECF No. 77 at 16, AR 521.02.3.A, emphasis added.) Therefore, the fact that Plaintiff was classified as close custody does not mean he was not also in administrative segregation or its equivalent.

Moreover, Plaintiff's claim that he was placed in administrative segregation in Unit 2 is consistent with AR 507.

AR 507 states that inmates will be temporarily placed in administrative segregation to protect the safety or the inmate, other persons, the institution or community *or to conduct investigations into violent misconduct*. (ECF No. 74-1 at 2.) In administrative segregation, inmates are initially housed in a single cell, and then are to receive an initial administrative segregation hearing within three days (which may be extended due to exceptional circumstances). Any delay in the hearing is to be communicated to the inmate in writing. (*Id*. at 3.) The classification committee will review inmates in administrative segregation every 30 days after the— initial hearing. (*Id*. at 5.) Plaintiff's move to Unit 2 appears consistent with AR 507's description of a placement in administrative segregation while an investigation into the fighting incident on June 3 was being conducted.

Despite Defendants' statement that Plaintiff was merely moved from one close custody unit to another, the evidence presented by Plaintiff creates a genuine dispute of material fact as to whether this was the case, and as to whether the conditions he faced in Unit 2 were atypical and significant. Taking the facts in the light most favorable to Plaintiff, the conditions he describes were certainly atypical when compared to his description of life as an inmate in Unit 7. The time frame under which he claims to have endured these conditions without a hearing or review—110 days—also appears significant when it is considered that he received no review of his status during that time.

**B. Qualified Immunity**

Defendants alternatively argue that they are entitled to qualified immunity.

The qualified immunity analysis consists of two steps: (1) viewing the facts in the light most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017). ; *see also Hines v. Youseff*, (9th Cir Feb 1, 2019).

It was clearly established in 2017, that a liberty interest in avoiding particular conditions of confinement may arise when the change in conditions amounts to an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Sandin v. Connor*, 515 U.S. 472 (1995); *Wilkinson*, 542 U.S. at 222; *Chappell*, 706 F.3d at 1064. In 2005, the Supreme Court held in *Wilkinson* that nonpunitive confinement in conditions that amount to an atypical and significant hardship can infringe on a liberty interest and trigger due process protections.

The Supreme Court has declined to establish a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson,* 545 U.S. at 223 (noting inconsistent conclusions among the circuits). To determine whether a particular form of restraint imposes "atypical and significant hardship" requires consideration of conditions or a combination of conditions or factors on a case by case basis. *Chappell,* 706 F.3d at 1064 (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)).

In *Sandin*, the inmate was sentenced to 30 days in punitive (not non-punitive) segregation for allegedly interfering with prison officials during a strip search. The Supreme Court concluded that his case did "not present a dramatic departure from the basic conditions of [his] indeterminate sentence" because the conditions in disciplinary segregation mirrored those in

administrative segregation and protective custody. *Sandin*, 515 U.S. at 485-86. There, the inmate was in lockdown 23 hours a day, while the other inmates were confined to their cells 12 to 16 hours a day. The court found his placement in disciplinary segregation for 30 days "did not work a major disruption in his environment." *Id.* Nor was there evidence his placement in disciplinary segregation would affect the duration of his sentence. *Id*. at 487.

In *Wilkinson*, the court found that conditions in Ohio's "supermax" facility constituted an atypical and significant hardship under "any plausible baseline" triggering due process protections. The conditions included that inmates had to stay in their seven by fourteen foot cells 23 hours a day, with constant illumination; they could not communicate with other inmates and were deprived of almost all human contact; they were limited to one hour of exercise a day in a small, indoor room; their placement in the facility was indefinite; and, an inmate moved to the facility who was otherwise eligible for parole would become ineligible. *Wilkinson*, 545 U.S. at 214-215, 224.

In *Brown v. Oregon Department of Corrections*, 751 F.3d 983 (9th Cir. 2014), the Ninth Circuit addressed a situation where a prisoner was placed in Oregon's Intensive Management Unit (IMU) for 27 months. Inmates in the IMU were in solitary confinement for 23 hours a day. *Id.* at 985. They got out of their cells for 40 minutes a day, 30 of which could be spent in recreation. *Id.*. Half of that time (15 minutes) could be spent in an "outside" facility within a 15 by 40 foot room with high, concrete walls covered by a metal grate. *Id*. This was compared to general population inmates who got 25 to 35 hours a week for recreation and social interaction, including two to five hours a day of outdoor recreation. *Id.* Inmates in the IMU got two non-contact visits per month, and a maximum of two visitors in a six-month period. *Id.* General population inmates got between 11 and 22 contact visits per month, and an unlimited number of

13

approved visitors. *Id.* IMU inmates were denied access to prison and law libraries, group religious worship, educational and vocational opportunities, telephone usage except in emergencies, access to televisions, and personal property. *Id.* Brown's status was reviewed four times between July 2008 and June 2009, with all four occurring in the first three months, and then he was reviewed every month and was kept at the same level pending successful completion of assigned packets.

The Ninth Circuit concluded in *Brown* that "under any plausible baseline, Brown's twenty-seven month confinement in the IMU without meaningful review 'impose[d] atypical and significant hardships on [him] in relation to the ordinary incidents of prison life.'" *Id.* at 988 (quoting *Sandin*, 515 U.S. at 484). The Ninth Circuit pointed out that while the "baseline for determining 'atypical and significant hardship' is not entirely clear[,] … *Sandin* seems to suggest that a *major* difference between the conditions for the general prison population and the segregated population triggers a right to a hearing[.]" *Id.* (quoting *Keenan*, 83 F.3d at 1089) (emphasis added).

The Ninth Circuit also noted that the Supreme Court has not clearly held that "conditions in the general population, as opposed to those in other forms of administrative segregation or protective custody, form the appropriate baseline comparator." *Id.* The Ninth Circuit, like the Supreme Court, declined to identify the baseline, but instead concluded that Brown's confinement to the IMU imposed an atypical and significant hardship under any baseline, focusing on the facts that Brown was in solitary confinement for almost 23 hours a day with almost no interpersonal contact, and was denied most privileges given to general population inmates. *Id.* at 988. The Ninth Circuit stated that "these conditions alone might apply to most solitary-confinement facilities," but the "crucial factor distinguishing confinement in the IMU"

14

was the duration of Brown's confinement: "a fixed and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the limited period of confinement with periodic review afforded inmates in ODOC's other segregated housing units." *Id.*

Taking the facts in the light most favorable to Plaintiff, he was moved from Unit 7 to Unit 2, where he was described as being in segregation. The conditions in Unit 2 were significantly more restrictive than in Unit 7, as described above, and he was essentially in solitary confinement with very limited interpersonal contact from June 2 to September 21, 2017. In addition, Plaintiff was forced to be housed near mentally ill inmates whose constant noise caused Plaintiff to lose sleep as well as excruciating headaches. He was not given a hearing and his status was not reviewed during those 110 days.

The court finds that under *Brown*, it was clearly established that such conditions could amount to an atypical and significant hardship triggering due process protections. Many of the conditions in *Brown* are similar to those Plaintiff faced in Unit 2. The evidence Plaintiff presents shows a *major* difference in conditions between Unit 2 and Unit 7. While the length of the term in segregation was much longer in *Brown,* the inmate was at least afforded three reviews in the beginning months.

In sum, the court finds Defendants are not entitled to qualified immunity. Therefore, Defendants' Motion for Partial Summary Judgment should be denied.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' Motion for Partial Summary Judgment (ECF No. 74); and **DISMISSING WITHOUT PREJUDICE** defendant Timothy Filson under Federal Rule of Civil Procedure 4(m).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: June 8, 2020

                                  _____
                                  William G. Cobb
                                  United States Magistrate Judge